**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVE A. BOONE,

    Plaintiff - Appellant,

  v.

MVM, INC., a California corporation
that does business in Colorado,

    Defendant - Appellee.

No. 08-1074

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 05-CV-02504-EWN-CBS)**

---

Thomas H. Stocker, Thomas H. Stocker, P.C., Lakewood, Colorado, for Plaintiff -
Appellant.

Jason M. Branciforte (Katherine A. Goetzl with him on the brief), Littler
Mendelson, P.C. Washington, D.C., for Appellee.

---

Before **HENRY,** Chief Circuit Judge, **MURPHY**, and **TYMKOVICH**, Circuit
Judges.

---

**MURPHY**, Circuit Judge.

---

## I. Introduction

Plaintiff-Appellant Dave Boone alleges he was wrongfully discharged from his position as contractor for Defendant-Appellee MVM, Inc. ("MVM"), with whom he had been providing security services to a U.S. Government agency in Iraq. He alleges he was terminated because he reported illegal and unethical conduct on the part of fellow contractors. The district court analyzed his wrongful discharge claim under Virginia law and dismissed it on the grounds that Virginia would not recognize such a claim on the facts of this case. On appeal, Boone argues only that the district court erred in its choice-of-law analysis. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **AFFIRMS** the judgment of the district court because Virginia has the greatest interest in having its laws enforced in this case.

## II. Background

Boone is a U.S. Army Special Forces retiree. MVM is a defense contractor that, during the time period relevant to this lawsuit, provided security services for the U.S. Government in Iraq. In early 2004, Boone learned from a fellow Special Forces retiree that MVM was recruiting, and he contacted the company about obtaining a position. MVM did not have any positions immediately available, so Boone subsequently began working for a different security firm and was deployed to Tashkent, Uzbekistan. He resigned shortly after arriving in Uzbekistan because he felt there were leadership problems and security issues. He contacted MVM

from Uzbekistan and was told there was a position available with a team deploying to Iraq. Boone traveled from Uzbekistan to MVM's Virginia headquarters. In Virginia he prepared for deployment by procuring clothing and tactical gear, completing administrative forms, taking a polygraph test, and obtaining an ID card. Boone also executed a contract with MVM titled "Independent Contractor Agreement" ("ICA"). The ICA stated it would be governed by Virginia law. Boone then deployed directly from Virginia to Iraq.

MVM deployments lasted ninety days. Following Boone's first ninety-day deployment, he met with MVM officers to express concerns about the unethical activities of other team members, including discussions about the formation of a competing company, the unauthorized purchase of weapons, and the submission of improper receipts. He verbally informed MVM he would no longer work on that contract as long as the offending team members were on the team. In August 2004, MVM contacted Boone, told him the offending team members were no longer involved, and asked him to redeploy to Iraq with the company, which he did.

During his second deployment, Boone relayed several concerns to his team leader. He stated one team member was having an improper affair with the staff member of a client, an active duty member of the military for whom the MVM team was providing security. He also claimed team members were procuring and possessing unauthorized weapons and explosives. On November 20, 2004, the

team's convoy was attacked by a vehicle-borne improvised explosive device. The convoy was temporarily stranded after the explosion and one of Boone's team members began firing his weapon at a nearby building, which Boone thought inappropriate because there was no visible threat in that direction.

About three or four days after the incident, Boone's team leader relayed concerns about Boone to MVM. The team leader believed Boone was a liability to the team and was not a team player, and requested that Boone be removed from the team. Two other team members prepared an After Action Report ("AAR") about the November 20 incident. The AAR stated that, after the explosion, the team had come under fire from twenty or thirty gunmen posted in buildings on either side of the road. The AAR claimed there were three insurgents killed and seven injured. According to Boone, the AAR was totally fabricated; he had not seen any enemy fire from surrounding buildings. Boone informed his team leader of his disagreement with the AAR.

On December 8, 2004, Boone's deployment ended, and he returned to the United States. He expected to be redeployed around January 20, 2005, and called the program manager at MVM on or about January 13 to coordinate his return. The program manager told him he was on hold because of the team leader's concerns arising out of the November 20 incident. Boone replied he believed the team leader was retaliating against him for his refusal to acquiesce in the improper conduct of his fellow team members. The program manager told Boone

he would investigate the matter and asked Boone to call the following week. On January 18, Boone called the program manager and was told he would not be redeploying with the team. Boone protested and said he was willing to go to MVM's headquarters and make his case. MVM then summoned Boone to a meeting at its headquarters. At the meeting, Boone reiterated his concerns about misconduct on the part of his team members. He was again told he would not be redeployed with the team.

During the entire time period in question, Boone had a home in Colorado where he lived with his wife when he was not deployed. His paychecks were sent to his Colorado address. Boone also owned some land and an unfinished cabin in Alaska. In 2004, he listed Alaska as his residence on his federal tax return, and he received an Alaska Permanent Fund dividend for 2004. He had an Alaska driver's license, paid unemployment taxes to Alaska in 2005, and listed Alaska as his residence in September of 2005 when he completed several documents in connection with his work for another security firm.

Boone filed suit in Colorado state court alleging two counts of breach of contract and one count of wrongful discharge in violation of public policy. MVM removed the case to federal court and subsequently moved for summary judgment on all counts. The district court granted summary judgment to MVM on all counts. On the wrongful discharge claim, the district court applied Colorado's choice-of-law rules and concluded Virginia law governed the claim. It granted

summary judgment because it concluded Virginia would not recognize a wrongful discharge claim on these facts.  Boone appeals only the dismissal of the wrongful discharge claim and does not challenge the district court's conclusion that, if Virginia law applies, his claim fails.

**III. Discussion**

Boone asserts the district court erred in applying Virginia law to his wrongful discharge claim.  He claims Colorado's choice-of-law rules favor the application of Colorado law.  This court reviews the district court's choice-of-law determination de novo.  *Anderson v. Commerce Const. Servs., Inc.*, 531 F.3d 1190, 1193 (10th Cir. 2008).  Federal courts sitting in diversity apply the choice-of-law rules of the forum state.  *See id.*  Colorado classifies wrongful discharge in violation of public policy as a tort claim.  *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 102, 104 (Colo. 1992).  For tort claims, Colorado follows the Restatement (Second) of Conflict of Laws and applies the law of the state with the most significant relationship to the occurrence and parties.  *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 509-10 (Colo. 2007).  The most significant relationship is determined by considering the following principles:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §§ 6(2), 145.  In applying these principles, courts must take the following contacts into account:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* § 145(2).  These contacts vary in relative importance depending upon the issue to be decided.[1]  *Id.*  In cases where the primary purpose of the tort rule is to deter wrongful conduct, the place where the conduct occurred may be more important than in other cases.  *See id.* § 145 cmts. c, e.  Additionally, "when the injury was

_____

[1]For personal injury actions, the law of the place "where the injury occurred determines the rights and liabilities of the parties, unless, with respect the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties."  Restatement (Second) of Conflict of Laws § 146. The Restatement does not indicate, and no Colorado cases have decided, whether a wrongful discharge tort is a personal injury action within the meaning of this Section.  In light of our holding that Virginia has the most significant relationship with the question at issue, it is unnecessary for this court to determine whether § 146, which creates a presumption in favor of the law of the state where the injury occurred, applies to this action.

caused by an act done in the course of the relationship, the place where the relationship is centered" should be considered. *See id.* § 145 cmt. e.

Boone argues the contacts with Colorado are more significant to his tort claim than are the contacts with Virginia. He argues he resided in Colorado when he was hired and fired, and Colorado is the state where he suffered damages. He also argues MVM did business in Colorado by contacting him for both employment and termination and by sending his paychecks to Colorado. MVM argues Virginia has a more significant relationship because it claims Boone was in Virginia when he was terminated, the decision to terminate Boone was made in Virginia, MVM is headquartered in Virginia, and the relationship was centered in Virginia. It also argues Boone is not a resident of Colorado, but rather a resident of Alaska, because he has an Alaska driver's license and made representations on various tax and employment forms that he was a resident of Alaska.

Boone claims the first contact to be considered under Restatement (Second) § 145, the place where the injury occurred, favors Colorado. Boone testified he was first told of the non-deployment decision over the phone while he was in Colorado. MVM claims this factor favors Virginia because after Boone continued to push his case, he was flown to Virginia, and in a meeting with MVM officers the decision was reaffirmed. On balance, this contact weighs more heavily in favor of Colorado. The Virginia meeting appears to have taken place after the decision was made and communicated to Boone. In other words, Boone was

-8-

discharged at the moment he was informed over the telephone, in Colorado, that he would not be redeployed.

The second § 145 contact, the place of the conduct causing the injury, favors Virginia. The decision to not redeploy Boone was made at MVM's place of business in Virginia. Boone argues the conduct leading to his discharge was the wrongdoing in Iraq. This conduct, however, did not cause Boone's injury. The conduct that caused Boone's injury was the decision by MVM to discharge him after he reported the misconduct that occurred in Iraq.

As to the third § 145 contact, the residence or place of business of the parties, MVM's headquarters is Virginia and it is incorporated in California. Boone asserts his residence is Colorado, although the district court discounted Colorado's interest in the matter because of representations made by Boone on tax and employment forms that he was a resident of Alaska. This dispute is best characterized as a factual dispute regarding where Boone intended to maintain a permanent residence. For the purpose of resolving the choice-of-law issue, this court will assume Boone's residence was Colorado.

The fourth § 145 contact, the state where the relationship between the parties was centered, favors Virginia. Although Boone characterizes Virginia as a mere "jumping off point" on the way to Iraq, the facts indicate it was more than that. Boone commenced the relationship between himself and MVM by contacting the company. Later on, when he terminated his contract with another

security firm, he precipitated his contract with MVM by calling MVM from Uzbekistan to let the company know he was available for hire. He went directly to Virginia from Uzbekistan and performed a variety of administrative tasks, including procuring clothing and equipment, completing administrative forms, taking a polygraph test, obtaining ID cards, and, most notably, signing the ICA, which stated it was governed by Virginia law. After his first deployment, Boone met with MVM officials, presumably in Virginia, and discussed his concerns about some of his team members. Similarly, after he became aware he would not be redeployed, he met with MVM officials in Virginia in an attempt to reverse the decision. Boone's security work on behalf of MVM did take place outside Virginia. Nonetheless, it was in Virginia where MVM personnel decisions were made, where Boone prepared for his initial deployment, and where Boone returned after each deployment. Based on these facts, Virginia was the place where the relationship was centered. *Cf. Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir. 1998) (concluding pilot's relationship with airline was centered in state where pilot began and ended his work assignments).

Several of the policy principles in § 6 of the Restatement are particularly relevant in this case. The Restatement seeks to protect justified expectations and create certainty, predictability, and uniformity of legal outcomes. Restatement (Second) of Conflict of Laws § 6(2)(d), (f). The parties agreed that the ICA would be governed by Virginia law, which created an expectation that Virginia

-10-

law would apply to employment disputes. *Oakes v. Oxygen Therapy Servs.*, 363 S.E.2d 130, 132 (W. Va. 1987) (concluding that the application of the law selected in an employment contract to a retaliatory discharge claim protects justified expectations under § 6(d) of the Second Restatement). This is not a situation, moreover, where the employer, by doing work or actively recruiting in other states, reasonably expects to be governed by the laws of those states. MVM did not seek out Boone's services; he initiated contact with the company. MVM subsequently contacted Boone in Colorado to ask if he was interested in deploying a second time, but it did so only after Boone had already worked for MVM. The record also does not indicate any work performed by MVM in Colorado. The policies of protecting justified expectations and ensuring certainty and predictability would best be served by applying Virginia law.

An alternative result would create the anomalous situation of different MVM contractors doing identical work for MVM in identical places, but nonetheless being subject to different employment laws based on their U.S. residences. This would conflict with the Restatement's preference for uniformity of results.

The Restatement also directs courts to consider the relevant policies and interests of the states in question. Restatement (Second) of Conflict of Laws § 6(2)(b)-(c). Both Colorado and Virginia recognize the tort of wrongful discharge in violation of public policy. *Martin Marietta*, 823 P.2d at 111;

-11-

*Lawrence Chrysler Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 809 (Va. 1996).

The conclusion of the district court, not challenged by Boone on appeal, was that

Virginia applies the tort to a narrower set of public policies than does Colorado.

*Compare Martin Marietta*, 823 P.2d at 111 (recognizing a wrongful discharge

claim when a company terminated an employee for his refusal to violate a federal

statute), *with Lawrence Chrysler*, 465 S.E.2d at 809 (explaining that Virginia has

recognized claims for wrongful discharge in violation of public policy only in

narrow circumstances when plaintiffs have identified specific Virginia statutes

establishing public policies). The scope of each state's tort of wrongful discharge

reflects a policy decision balancing the protection of employees against the

shielding of employers from excessive liability. Because MVM has its

headquarters in Virginia, Virginia has a strong interest in having its policies apply

to the company. Colorado has comparatively little interest in regulating MVM as

an employer. Colorado does have an interest in protecting its employees, but this

interest is not particularly strong here because Boone actively sought to work for

MVM outside of Colorado. Virginia, in summary, has a greater interest in seeing

its policies carried out in this case.

Even if Boone suffered the injury in Colorado and is a resident of

Colorado, these contacts are not sufficient to render Colorado the state with the

most significant relationship. Other courts considering wrongful discharge claims

have weighed the place where the relationship was centered more heavily than the

plaintiff's place of residence or the place where the plaintiff received notice of the termination.[2]  *See, e.g.*, *Fredrick*, 144 F.3d at 504; *Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1325 (5th Cir. 1995); *Oakes*, 363 S.E.2d at 132.  The economic impact of Boone's discharge will likely fall upon his state of residence, so the Colorado contacts are not totally irrelevant, but they are not as significant as Virginia's substantial interest in regulating the conduct of Virginia employers, fulfilling the expectations of the parties that Virginia law would be applied, and maintaining the uniform treatment of similarly situated employees.  Virginia law, therefore, is the most appropriate law to apply in this case.

## IV. Conclusion

The district court did not err in concluding Virginia had the most significant relationship to Boone's alleged wrongful discharge from MVM.  Because Boone does not appeal the district court's conclusion that Virginia law

---

[2]Boone relies heavily upon *Dreith v. National Football League*, 777 F. Supp. 832, 838 (D. Colo. 1991), for the proposition that the place of injury is the paramount factor.  The plaintiff in *Dreith*, a former football referee, brought a suit for intentional infliction of emotional distress.  *Id.* at 837-38.  He claimed the NFL placed him in unfamiliar and difficult officiating situations in an attempt to humiliate him on national television and give the league an excuse to fire him. *Id.* at 839.  The court concluded that Colorado, the state where the plaintiff resided and suffered the injury, had a more significant relationship to the case than New York, where the NFL headquarters are located and where the relationship was centered.  *Id.* at 838.  Although *Dreith* can be read to support Boone's position, this court declines to follow it because it lacks persuasive reasoning explaining *why* the state where the plaintiff incurred the injury has a more significant relationship than the state where the relationship was centered and the wrongful conduct occurred.  *See id.*

bars a wrongful discharge claim under these circumstances, the decision of the

district court is hereby **AFFIRMED**.