**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MID-CENTURY INSURANCE
COMPANY, a California corporation,
a/s/o The Charter at Beaver Creek
Condominium Association,

     Plaintiff - Appellant,

v.

INSULVAIL, LLC, a Colorado limited
liability company,

     Defendant - Appellee.

and

FIRE SPRINKLER SERVICES, INC., a
Colorado corporation,

     Defendant.

No. 13-1428
(D.C. No. 1:12-CV-00421-RPM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO,** and **MATHESON**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The Charter at Beaver Creek ("Charter"), a Colorado condominium complex, sought to stop cold air flow from the attic into the bathroom of one of its units. In January 2010, it hired insulation contractor InsulVail, LLC to install insulation above the bathroom ceiling. While installing the insulation, InsulVail employee Martin Cornejo saw that some preexisting insulation had fallen, leaving a gap in the insulation covering a knee wall.[1] He did not report or replace the fallen insulation. A year later, water froze in a fire sprinkler pipe in the attic, causing a pipe fitting to break.[2] The resulting water leak damaged several Charter units.

Mid-Century Insurance Company ("Mid-Century"), Charter's subrogee, sued InsulVail for breach of contract and negligence. It claimed InsulVail breached its duty to perform in a "workmanlike fashion" by installing the insulation so as to prevent warm air from the bathroom from reaching the wet sprinkler system and by failing to report or replace the fallen insulation.[3] InsulVail moved for summary judgment, which the district court granted. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] A knee wall is a short wall extending to the top of a roof's framing.

[2] The fire sprinkler system at issue is a wet sprinkler system. In a wet sprinkler system, pipes contain continuously-flowing water that discharges immediately when heat from a fire opens the sprinklers. In a dry sprinkler system, pipes contain pressurized air. Wet sprinkler systems are therefore susceptible to freezes, while dry sprinkler systems are not.

[3] The parties erroneously quote the contract as having imposed a duty to perform in a "workmanlike manner." The actual language of the contract is "workmanlike fashion." App. at 51.

## I. BACKGROUND

### A. *Factual History*

In January 2010, Charter's Maintenance Director, Bryan Gonzales, contacted InsulVail regarding a cold bathroom in Unit 5345. InsulVail sent salesman Kevin Wall to Charter. Mr. Wall did not fully inspect the attic, but did examine where the insulation would be installed. Following Mr. Wall's visit, Charter contracted with InsulVail to insulate the area above the bathroom ceiling. The agreement stated InsulVail's "work will be completed in a workmanlike fashion in accordance with the standards of the industry." App. at 51.

Later that month, InsulVail sent Mr. Cornejo to install the insulation. The area where Mr. Cornejo worked was approximately 240 square feet and comprised only a portion of the attic. While installing the insulation, Mr. Cornejo saw preexisting insulation missing from a knee wall in another part of the attic. The insulation had fallen to the floor, leaving a gap in the insulation covering the knee wall. Mr. Cornejo did not replace the fallen insulation or report it to anyone. The record shows neither InsulVail nor Charter knew there was a wet sprinkler system in the attic at the time of installation. *Id*. at 93, 142.

In October 2010, Charter hired Fire Sprinkler Services ("FSS") to conduct its annual inspection and to verify the integrity of the fire protection systems at Charter. FSS reported all wet sprinkler pipes were located in areas that were not subject to freeze.[4]

---

[4] In its complaint, Mid-Century alleged FSS failed to inspect the portion of the wet sprinkler system located above Unit 5345.

In October or November 2010, Charter conducted its annual walk-through of the attic and apparently did not notice any problems with the insulation or the sprinkler systems.

On January 2, 2011, outdoor temperatures near Charter registered between -5 and -18 degrees Fahrenheit. Water froze in a wet sprinkler pipe in the attic, causing a pipe fitting to break. This fitting was above a room in Unit 5345 adjoining the bathroom on the "opposite side of a laminated beam in the attic enclosure where InsulVail installed R-19 blown-in fiberglass insulation." *Id.* at 103. Water flowed from the broken fitting, damaging several building units. Mid-Century paid for the damages and brought this action as subrogee of Charter.

## B. *Procedural History*[5]

In the district court, Mid-Century alleged InsulVail had breached contractual and tort duties to install insulation in a "workmanlike fashion" by isolating the wet sprinkler system from the heated living space below it, thereby leaving it vulnerable to freezing. Mid-Century also argued InsulVail had breached contractual and tort duties to replace or report the fallen insulation Mr. Cornejo had observed. InsulVail moved for summary judgment, arguing it owed no such contractual or tort duties to Charter.

The district court granted InsulVail's motion for summary judgment. It rejected as "implausible" Mid-Century's claim that if the insulation had not been installed, the warm air from the bathroom would have prevented the freeze. *Id.* at 206. The court noted the pipe fitting had not frozen during the year following InsulVail's work. It determined the

---

[5] Mid-Century originally filed this case against both InsulVail and FSS, but has since settled its claims against FSS.

missing insulation in the knee wall caused the pipe to freeze. The court concluded

InsulVail had no duty to report or replace the missing insulation because such a duty

would have been beyond the limited function InsulVail contracted to perform.

Mid-Century appeals.[6]

## II. **DISCUSSION**

"We review the district court's grant of summary judgment de novo." *Thomson v.*

*Salt Lake Cnty.*, 584 F.3d 1304, 1311 (10th Cir. 2009). "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In

determining whether summary judgment is warranted, the court draws reasonable

inferences from the evidence in the light most favorable to the nonmoving party. *See*

*McWilliams v. Jefferson Cnty.*, 463 F.3d 1113, 1116 (10th Cir. 2006).

A federal court sitting in diversity must apply state law to the substantive issues of

the appeal, and determines which state's law applies by using the forum state's choice-of-

law rules. *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir.

2009). In contract and tort, Colorado follows the "most significant relationship"

---

[6] The appendix filed by Mid-Century contains selected materials from the discovery record in the district court. Although there may be other materials relevant to the issues on appeal, we rely on the parties to provide them. "[W]e have no obligation to go further [than the appendix] and examine documents that should have been included, and we regularly refuse to hear claims predicated on record evidence not in the appendix." *Burnett v. Southwestern Bell Tel., L.P.*, 555 F.3d 906, 907 (10th Cir. 2009) (quotations omitted).

approach of the Restatement (Second) of Conflict of Law.  *See id.*; *Boone v. MVM, Inc.*, 572 F.3d 809, 811-12 (10th Cir. 2009).  Colorado has the most significant relationship to the issues in this appeal.  The parties agree Colorado law applies.

On appeal, Mid-Century argues (A) InsulVail breached its contract with Charter, (B) InsulVail breached tort duties to Charter, and (C) the district court erred in awarding costs.  We disagree and affirm.

## A.  *Breach of Contract Claim*

### 1.  **Legal Background**

Our task is "to determine and give effect to the intent of the parties" to a contract. *See Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000) (en banc).  As a general rule, a contract's language reflects the parties' intent.  *Id.*  We consider extrinsic evidence to prove intent only when a contract's terms are ambiguous.  *Id.*  A provision is ambiguous "if it is susceptible to more than one reasonable interpretation."  *Union Ins. Co. v. Houtz,* 883 P.2d 1057, 1061 (Colo. 1994) (en banc).

Whether a contract is ambiguous is a question of law.  *Stegall v. Little Johnson Assocs., Ltd.*, 996 F.2d 1043, 1048 (10th Cir. 1993).  When a contract is unambiguous, "a trial court's interpretation of a contract presents an issue of law which is reviewed de novo on appeal."  *Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc.*, 532 F.3d 1063, 1069 (10th Cir. 2008) (quotations omitted).  If a contract is ambiguous, the meaning of its terms is generally an issue of fact.  *Stegall*, 996 F.2d at 1048.

- 6 -

2. **Analysis**

Mid-Century argues InsulVail breached a contractual duty to perform in a "workmanlike fashion" by (1) installing the insulation so as to isolate the wet sprinkler system from the heated space below, and (2) failing to act or report after seeing that preexisting insulation had fallen from a knee wall. InsulVail acknowledges it contracted to perform the installation in a "workmanlike fashion." But it contends its contractual duty was limited to installing insulation over the bathroom and did not include responsibilities regarding the wet sprinkler system or preexisting insulation. We agree with InsulVail on the scope of its contractual duty.

a. *Contract Terms*

The contract's terms are clear and unambiguous. InsulVail contracted to perform a specific and limited job. The contract is short and simple; it provides InsulVail would install insulation in the "Restroom Lid" as follows:

> R-19 fiberglass loosefill to drop ceiling
> 2" rigid foam board insulation to box around can lights

App. at 52. The contract also states "[a]ll work will be completed in a workmanlike fashion in accordance with the standards of the industry." *Id.* at 51. But this "work" encompasses only the insulation installation in the "Restroom Lid." The contract says nothing about the wet sprinkler system or preexisting insulation.

InsulVail did what it contracted to do—it blocked cold air flow from the attic into the bathroom space below. It installed the insulation consistently with the insulation in other attic spaces at Charter. Mid-Century has not shown the insulation was installed

- 7 -

incorrectly according to industry standards or that industry standards require installers to

report or replace preexisting insulation that had fallen.[7]

---

[7] In the appendix, Mid-Century included selected pages from and references to the depositions of its expert, Kenneth Murphy, and InsulVail's expert, Dennis Marshall, but this testimony does not even begin to elucidate industry standards.

The passage from Mr. Murphy's deposition does not address treatment of preexisting installation at all, and he did not know the industry standard for insulation installation in relation to water sprinkler pipes:

> Q. Reasonable to assume that there was going to be an annual inspection by somebody qualified to inspect wet systems?
> A. Well, I would think so but I'm not sure of the requirements by the fire inspection company.
> Q. What's the standard in the industry for what insulation people can or cannot do with respect to wet systems?
> A. I don't know.

App. at 36.

The selected passages from Mr. Marshall's deposition fail to include questions specifically about industry standards. Mid-Century counsel did ask him to comment on Mr. Wall's deposition testimony that he "looks for plumbing" in preparing "an estimate for new construction" so as not to isolate plumbing from heat, but does not do so for an existing structure. *Id*. at 136. In response, Mr. Marshall said, "The only thing I can ascertain is existing construction is working, new construction is yet to work." *Id*. This attempt to understand what Mr. Wall said does not state Mr. Marshall's opinion on an industry standard or even suggest such a standard exists.

Counsel also asked whether an "insulation installer" should "make sure that plumbing is not isolated from warmth that would keep water in the pipe from freezing." *Id*. at 137. Mr. Marshall said, "You could say, yes, depending on where it was," that Mr. Wall should have looked for this "if it was readily noticeable," and that pipes were visible to him (Mr. Marshall) when he looked in the attic. *Id*. Although this testimony seems to opine on what should have been done, it is phrased in highly speculative terms—"could," "depending," "if." It does not specify whether by "readily noticeable" he meant it was readily noticeable that pipes actually contained water. Most importantly, it again does not even purport to identify industry standards. Perhaps equally important, the questions asked did not account for the narrow terms of the Charter-InsulVail contract that called for a limited insulation patch above the bathroom of Unit 5345.

Finally, Mr. Marshall testified it would have been "kind" had Mr. Cornejo reported the fallen preexisting insulation, but "there wasn't anybody else there," and

- 8 -

Because the contract's terms are clear, we need not consider extrinsic evidence—most notably, the Bid Request—to discern the parties' intent.[8] The Bid Request is an internal document produced by InsulVail to instruct its employees about the job at Charter. Mid-Century has presented no evidence the Bid Request formed a part of the contract. In fact, the Bid Request was not even provided to Charter.

In any case, the Bid Request does not demonstrate InsulVail intended to do anything with the preexisting insulation. It instructs the installer to "Fix Vapor" and "Fix Knee Wall," *id.* at 152, but those instructions pertain to any vapor barrier[9] or knee wall insulation the installer might have had to pull down to install the new insulation. The Bid Request instructions do not suggest the installer must fix any preexisting vapor barrier or knee wall insulation that may have fallen.[10]

---

"maybe there wasn't anybody there that he could tell." *Id*. at 134. Again, this testimony hardly speaks to an industry standard.

Mid-Century provides no other appendix materials on industry standards. We conclude a reasonable jury could not find from the appellate record that InsulVail's installation of the insulation or its handling of the fallen insulation fell short of performing the contract in "workmanlike fashion" according to industry standards. *See Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (stating the reasonable jury standard).

[8] Mid-Century discusses the "Work Order" in its briefing. The Work Order is actually the Bid Request.

[9] A vapor barrier prevents cold air from passing through a space.

[10] Mr. Wall's deposition makes this clear:

> Q. What did it mean, "Fix vapor"?
> A. Vapor barrier, because I imagine the guys having to pull the top layer of it down to blow in there. . . .
> Q. After they finished their work—

b. *Causation*

Even if InsulVail had a contractual duty to install the insulation to avoid isolating the wet sprinkler system from warm air, Mid-Century has not presented evidence in the appendix demonstrating the insulation installation caused the pipe freeze. *See City of Westminster v. Centric-Jones Constructors*, 100 P.3d 472, 477 (Colo. App. 2003) (noting an appellant must show, among other things, "resulting damages" from the "failure to perform the contract" in a breach of contract claim); *see also id.* at 485 (finding the appellant had not put forth enough evidence on causation in a negligence claim, thereby affirming the district court's grant of summary judgment).

InsulVail has pointed to the lack of causation evidence. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (summary judgment movant may meet its initial burden "by pointing out to the court a lack of evidence for the nonmovant on an

---

A. Uh-huh.
Q. —they needed to fix the vapor barrier?
A. Right. . . .
Q. In the next entry, "Fix knee wall," what does that mean?
A. That's where they pulled—would have to pull the insulation out to have to blow in through there.
Q. And then when they're done, they need to put the insulation back after they've blown in on the ceiling?
A. Correct.
Q. So is your understanding that when the installation crew finished their work in the ceiling lid above the bathroom of Unit 5345, they were supposed to fix the vapor barrier and fix the knee wall and make sure that the insulation was in place and the vapor barrier was in place, it was all intact?
A. In the areas that they had to pull down to get to the—to do their job, yes.

App. at 125-26.

essential element of the nonmovant's claim"). Mid-Century has provided no evidence—

expert or otherwise— in the appellate record that the insulation installation caused the

pipe freeze. *See id.* (noting the burden then shifts to the nonmovant to come forward with

evidence to create a genuine issue of material fact on that element). In fact, Mid-Century

admitted at the summary judgment motion hearing that the missing insulation from the

knee wall, rather than the insulation installation, was the primary cause of the pipe freeze.

App. at 214-15. And the district court found, similarly, that the missing insulation, not

the insulation installation, was the cause. *Id.* at 206-07.

*       *       *

For these reasons, we hold as follows. First, InsulVail did not owe Charter a

contractual duty to install insulation so as not to isolate the wet sprinkler system. Even if

it did, Mid-Century's claim fails for lack of causation evidence. Second, InsulVail did

not owe a contractual duty to replace or report preexisting insulation that had fallen.

B. *Negligence Claim*

1. **Legal Background**

Under Colorado law, to establish negligence a plaintiff must show "a legal duty of

care on the defendant's part, breach of that duty, injury to the plaintiff, and causation, i.e.,

that the defendant's breach caused the plaintiff's injury." *HealthONE v. Rodriguez ex

rel. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002) (en banc).

"Whether a defendant owes a legal duty to a particular plaintiff is a question of

law." *Metro. Gas Repair Serv., Inc. v. Kulik*, 621 P.2d 313, 317 (Colo. 1980). "The

court determines . . . the existence and scope of the duty." *Id.* "If a court determines that

- 11 -

the defendant owed the plaintiff a legal duty, the question of whether the defendant has breached that duty and thereby caused the plaintiff damage is for the jury." *Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002).

In determining whether a duty exists, the law distinguishes between misfeasance—"active misconduct that injures others"—and nonfeasance—"failure to take positive steps to protect others from harm." *See id*.

In misfeasance cases, Colorado courts consider the *Taco Bell* factors: "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the defendant." *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo. 1987) (en banc) (quotations and alterations omitted). A court may also consider "any other relevant factors based on the competing individual and social interests implicated by the facts of the case." *Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo. 1993) (en banc) (quotations omitted). As such, "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards." *Taco Bell*, 744 P.2d at 46.

"[T]he situations in which nonfeasance leads to liability are more circumscribed than those for misfeasance." *Smit*, 72 P.3d at 372. A duty in nonfeasance cases exists only in limited circumstances—for example, when there is a "special relationship"

- 12 -

between the actor and the injured party.[11] *See Western Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1159 (Colo. App. 2008). Contractual obligations can also give rise to a duty in nonfeasance cases if a party has undertaken to render services necessary for the protection of the other's person or things. *Id.* at 1159-60 (citing Restatement (Second) of Torts § 323).

2. **Analysis—Scope of Duty**

Contracts can give rise to a tort duty to perform work with reasonable care and skill. *See Kulik*, 621 P.2d at 317-18. Colorado law recognizes such a duty for contractors performing a service contract. *See Samuelson v. Chutich*, 529 P.2d 631, 633-34 (Colo. 1974) (en banc) (adopting the articulation of the duty in *Gagne v. Bertran*, 275 P.2d 15, 21 (Cal. 1954)). InsulVail concedes it had a duty to perform its work with reasonable care and skill.

The critical and deciding issue is the scope of this duty.[12] Mid-Century argues the scope encompasses (1) a duty to ensure the insulation would not create a risk of freezing, and (2) a duty to replace or report the fallen insulation Mr. Cornejo observed. We disagree.

---

[11] Special relationships are typically those in which "the defendant either had a treating or supervisory relationship with the decedent or maintained custodial control over the decedent's environment." *English v. Griffith*, 99 P.3d 90, 94 (Colo. App. 2004).

[12] The scope of a tort duty is a question of law and properly decided on summary judgment. *See Kulik*, 621 P.2d at 317 n.6 (treating the issue of whether a contractor had to conduct a safety inspection as relating to the scope of a legal duty); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1265 (Colo. 2000) (en banc) (interpreting *Kulik* as holding that conducting a safety inspection was within the scope of a contractor's legal duty).

- 13 -

a. *Duty to prevent a freeze*

Mid-Century alleges misfeasance, contending that InsulVail improperly installed insulation so as to prevent warm air from reaching the wet sprinkler system. But InsulVail did what it contracted to do—it blocked the cold air draft from the attic into the bathroom space below, and did so in a manner consistent with the insulation in the rest of the attic. The question is whether InsulVail's duty extended beyond performing the tasks specified in the contract to preventing a freeze in the attic.[13] We must consider the *Taco Bell* factors.[14]

First, the risk of substantial damage from freezing water pipes weighs in favor of finding a duty. *See Taco Bell*, 744 P.2d at 46. The other factors, however, do not.

The second *Taco Bell* factor weighs the foreseeability and likelihood of injury against the social utility of InsulVail's work. *Id.* The pipe freeze was not foreseeable or likely. InsulVail did not know there was a wet sprinkler system in the attic, and Mid-

---

[13] A duty to install insulation to guard against wet sprinkler pipes from freezing might have required InsulVail, among other things, (1) to be able to identify wet sprinkler pipes; (2) to inspect the attic to determine whether such pipes are present; (3) to evaluate the thermal properties of the attic and determine whether and how insulation could be installed (a) to prevent the cold air flow into the bathroom underneath the attic, and, at the same time, (b) to avoid isolating the pipes in a manner that would make them more vulnerable to freezing. As explained above, the contract imposes no such duty. As explained below, the *Taco Bell* factors do not support such a duty in tort either.

[14] Mid-Century incorrectly argues InsulVail improperly raised for the first time on appeal "its discussion of the *Taco Bell*, 744 P.2d at 46, factors to determine fairness in ascertaining whether a duty is created and, if so, the proper scope." Aplt. Reply Br. at 10. InsulVail raised the *Taco Bell* factors in its motion for summary judgment before the district court. Furthermore, we may affirm on any basis supported by the record. *Jordan v. U.S. Dep't. of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011).

Century has not presented evidence that it should have known.[15] Even Charter was unaware of the wet sprinkler system's existence at the time of installation. Further, the injury was not likely because InsulVail installed the insulation consistently with insulation in the rest of the attic. As for social utility, installing insulation contributes to the maintenance and habitability of the building. And permitting insulators to install without having to guard against a pipe freeze would keep the routine task of installation cheaper and faster. This second *Taco Bell* factor, therefore, weighs against finding a duty.

Third, a duty to guard against wet sprinkler pipes from freezing would have required InsulVail not only to know about a wet sprinkler system but also to evaluate and address the vulnerability of that system as a whole, tasks that would constitute a substantial burden on routine installation installers.[16] *See Lewis v. Emil Clayton*

---

[15] *See supra* note 7. Even if Mid-Century had demonstrated industry standards, "such evidence is not conclusive on the issue of due care" in tort. *Yampa Valley Elec. Ass'n, Inc. v. Telecky*, 862 P.2d 252, 257 (Colo. 1993) (en banc).

[16] The task of evaluating a wet sprinkler system is Charter's responsibility. At least one Colorado court has declined to define a party's existing duty to include obligations expressly conferred on the other party. *See Dunn v. American Family Ins.*, 251 P.3d 1232, 1237 (Colo. App. 2010). Eagle County, where Charter is located, has adopted building and fire codes, which in turn adopt the National Fire Protection Association ("NFPA") Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems ("NFPA 25"). NFPA 25 places the responsibility for inspecting, testing, and maintaining wet sprinkler systems on the owner of the property. NFPA 25 4.1.1. This responsibility can be delegated through "specific provisions" NFPA 25 4.1.2.3, but no such provisions exist in the contract between Charter and InsulVail. Regardless, the Charter could have only delegated the responsibility to "the occupant, management firm, or managing individual." *Id.* Furthermore, NFPA 25 provides inspections shall be performed by those who have "developed competence through training and experience." NFPA 25 4.1.2.2. Mid-Century has not presented

*Plumbing Co.*, 25 P.3d 1254, 1257 (Colo. App. 2000) ("[S]ervice providers should perform their contractual duties competently and refrain from causing injury. But, it is unreasonable to hold that such providers have a duty to investigate and remedy all other conditions nearby. We agree that this would be both costly and impractical."). Charter recognized this when it hired FSS to conduct an inspection of the attic and when it conducted its own walk-through of the attic. This third *Taco Bell* factor favors InsulVail. *See Taco Bell*, 744 P.2d at 46.

Fourth, the consequence of placing this additional duty on InsulVail would transform what it was hired to do. *See id.* at 46, 49. The contract was limited in scope and made no mention of the wet sprinkler system.

The *Taco Bell* factors counsel against finding a duty to prevent a pipe freeze. Case law lends support to this conclusion. In *Lewis*, the Colorado Court of Appeals considered whether liability should arise from an explosion that occurred from the failure of a gas connector on a basement stove. 25 P.3d at 1255. The plaintiffs alleged the water heater installer had "failed to inspect the gas piping, to see a readily apparent dangerous brass flex connector connected to a nearby gas stove and remove or replace the connector, and to warn the occupants of the house of this dangerous condition." *Id.* In holding the installer had no duty to inspect the gas stove, the court noted such tort liability cannot arise from limited contracts:

---

evidence InsulVail has developed competence to conduct inspections of attics or pipes for heating properties.

[D]efendant's contractual services were limited to installing a water heater and to work related to the water heater. Thus, unlike in *Kulik*, where the defective valve was related to the boiler system, defendant's obligations under the contract here were not related to the stove's gas connector, which ultimately caused the explosion.

*Id.* at 1256.

Mid-Century relies upon *Kulik*. In that case, Metropolitan Gas Repair Service agreed to install a new motor on the boiler of a residential heating system. 621 P.2d at 316. The boiler later exploded because a safety relief valve had been plugged. *Id.* Even though Metropolitan did not work directly on the safety valve, the Colorado Supreme Court held the company had an independent tort duty, arising from the contract, to inspect the valve. *Id.* at 317-19.

*Kulik* is distinguishable from this case on four grounds. First, the court in *Kulik* held Metropolitan had a duty to inspect the valve, which was located on the boiler on which Metropolitan contracted to work. By contrast, Mid-Century asks this court to impose a duty on InsulVail to inspect the space surrounding the section in which it was contracted to work. *See Lewis*, 25 P.3d at 1256 ("Plaintiffs have not presented legal authority to support their contention that defendant had a duty to inspect an appliance upon which it was not asked to perform work."); *see also Rumbaoa v. J. Rudnick & Sons, Inc.*, 863 F.Supp. 1193, 1197 (D. Haw. 1994) ("[I]n *Kulik*, a written contract existed which imposed an *ongoing* duty to service the *entire* boiler system that caused the harm, whereas, in the case at bar, no such contract related to the garnett machine which caused the harm to plaintiff.").

- 17 -

Second, Metropolitan's business was repairing boilers. *See Kulik*, 621 P.2d at 316. Mid-Century does not demonstrate that InsulVail's service or expertise extended beyond the installation of insulation to the assessment of wet sprinkler systems. Unlike the homeowner in *Kulik*, who relied on Metropolitan for a safe boiler, Charter did not rely on InsulVail but instead hired FSS to conduct an inspection and then conducted one itself. *See Rumbaoa*, 863 F.Supp. at 1197 ("WBSCO performed no act which would have caused Coyne or Rumbaoa to rely on WBSCO for the proper manner in which to clean the garnett machine, whereas the homeowner in *Kulik* entered into a written contract for the very purpose of relying on the expertise of the heating contractor to ensure that the boiler system operated safely.").

Third, injury was foreseeable in *Kulik* because the plugged condition of the safety valve was readily apparent; the plugged valve was at eye level and in plain view. *Kulik*, 621 P.2d at 318. As explained above, the injury was not foreseeable here because neither Charter nor InsulVail knew there was a wet sprinkler system in the attic.

Finally, in *Kulik*, the contractor indicated he had "checked boiler" during his work. *Id.* at 316. Here, InsulVail did not claim it had inspected the wet sprinkler system in the attic. *See Rumbaoa*, 863 F.Supp. at 1197 ("[T]he contractor in *Kulik* indicated that he did check the boiler on a previous occasion, whereas, WBSCO, if it had any contact with the offending garnett machine, it was merely to supply replacement parts; WBSCO never indicated that it had performed any sort of overall check on the garnett machine.").[17]

---

[17] Another relevant Colorado case is distinguishable. In *Lembke Plumbing and Heating v. Hayutin*, 366 P.2d 673 (Colo. 1961), the Colorado Supreme Court held a

Even if InsulVail owed Charter a tort duty to install the insulation so as not to isolate the wet sprinkler system from heat, as we explained previously, Mid-Century has failed to show in the appellate record any breach of that duty caused the damage here.

b. *Duty to report or replace preexisting insulation that had fallen*

InsulVail did not have a duty to report or replace preexisting insulation that had fallen. Failure to report or replace amounts to nonfeasance. Courts have been reluctant to impose liability in cases of nonfeasance. *See, e.g.*, *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987) (en banc). No special relationship exists between InsulVail and Charter that would give rise to a duty. *See Lewis*, 25 P.3d at 1256 (holding a plumber/customer relationship is not special for nonfeasance duty purposes). Further, the contract between Charter and InsulVail did not address preexisting insulation. Nor does Mid-Century demonstrate Charter depended on InsulVail for the replacement or reporting of the fallen insulation. To the contrary, Charter hired FSS to conduct an inspection in

plumbing contractor liable for failing to properly embed a pipe, which led to water leakage and damage to a home. The homeowners in *Lembke* hired a plumbing expert. *Id.* at 674. Properly embedding the pipe was presumably Lembke's responsibility. Here, Mid-Century hired InsulVail for a routine installation job, not to guard against the freezing of a wet sprinkler system. Furthermore, the contract in *Lembke* required Lembke to install plumbing, and the installation itself was done negligently. *Id.* at 674-75. Here, InsulVail installed the insulation exactly as asked. Finally, the *Lembke* court indicated the plumbing contractor had contravened established plumbing practice in its installation. *Id.* at 675 ("Sound and acceptable plumbing practice required protection on the easterly side in the same manner as that provided on the westerly."). Here, Mid-Century has presented no evidence that the industry requires insulation installers to guard against the freezing of a wet sprinkler system when the existence of the system is unknown. *See supra* note 7.

the year between InsulVail's work and the pipe freeze, and itself conducted a walk-through of the attic during this time.

## C. *Awarding of Costs*

We review the district court's award of costs for abuse of discretion. *Brockman v. Wyoming Dep't. of Family Servs.*, 342 F.3d 1159, 1169 (10th Cir. 2003). Mid-Century presents no argument the district court abused its discretion. We find nothing in the record to indicate error and affirm the award of costs.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

- 20 -